THE CHICAGO CORPORATION, a corporation of the State of Delaware,

*vs.*

JAMES THEUS MUNDS, FRANCIS D. WINSLOW, CLINTON T. REVERE, LOUIS DE L'AIGLE MUNDS, LOUIS L. ALLEN, HENRY T. DUMBELL, WARREN ACKERMAN, DORLAND DOYLE, HOWARD P. INGELS, JOHN W. FULLER POTTER, PHILIP LYNDON DODGE, ROSWELL C. TRIPP, HAROLD W. DAVIS, FRANK S. THOMAS, GUY M. STANDIFER AND HAROLD FITZGERALD, a co-partnership trading under the firm name of Munds, Winslow & Potter.

*New Castle, April 25, 1934.*

144

*Aaron Finger,* of the firm of Richards, Layton -& Finger, and *Robert H. O'Brien,* of the firm of Simpson, Thacher & Bartlett, of New York City, for complainant.

*Clarence A. Southerland,* of the firm of Ward & Gray, for defendants.

THE CHANCELLOR: The defendants hold shares of convertible, preference stock of Continental Chicago Corporation which merged with Chicago Investors Corporation into a corporation called The Chicago Corporation, the com-

plainant in this cause. Continental Chicago Corporation appears to have been an investment corporation. Its assets totalled $21,658,694.02, consisting of cash amounting to over three million dollars, short term securities and notes receivable of nearly three million dollars, investments in the form of stocks and bonds of over fifteen million dollars and a few other smaller assets. The defendants objected to the merger and made demand for payment of the value of their stock.

Section 61 of the General Corporation Law (Revised Code 1915, § 1975, as amended by 35 Del. Laws, c. 85, § 20) provides that in case of a merger, any stockholder of a merging company who objects to the merger and complies with the procedure prescribed by the section shall be paid by the consolidated corporation "the value of his stock at the date of consolidation." Appraisers were duly appointed in accordance with the terms of the section referred to, who valued the stock of the defendants at seventeen dollars and twenty-five cents per share. The price per share was based by the appraisers, as shown by their report, on the sole consideration that on December 20, 1932, "the date of the consolidation," the convertible preference stock of Continental Chicago Corporation which the defendants hold was traded in on the Chicago Stock Exchange and the closing price was seventeen and one-quarter. The appraisers stated in their report that while they had examined the balance sheet and portfolio of Continental Chicago Corporation, they were of the opinion that value as the term is used in Section 61 of the act should be deemed market value and not the asset value of the stock appraised. They therefore considered the closing market quotation of the stock as the sole element in appraising its value.

The defendants insist that the appraisers appraised the value of their stock upon an improper basis and that they are therefore not bound to accept payment on that basis. They contend that their stock should be appraised on the basis of the value of the assets and that when so appraised it

will have a value much larger than that shown by the market on December 20, 1932.

The question therefore is whether or not the "value" which *Section* 61 declares shall be paid to an objecting stockholder for his stock means value as shown by market transactions on the consolidation date. The complainant contends that it does, when there is a market. It concedes that in cases where the stock has no market, other indices of value must be resorted to. If "value" as. used in the statute means "market value," the contention and the concession amount to this, that the opinion of buyers and sellers of stock is a sure indication of a stock's value, but if there is no such opinion available because of a lack of purchases and sales all other elements that may be legitimately considered for the ascertainment of a stock's value should be taken into account in order to ascertain what the market value. ought to be if transactions of purchase and sale occurred. This is so, if as is contended the Legislature intended "value" to mean the same thing as "market value." On that hypothesis, the result would be that when there is no market divers elements could be taken into account in arriving at a calculated market value, but, if there is a market, none of those same divers elements could be consulted.

The complainants rely on two New Jersey cases in support of their contention that when the statute speaks of value the measure thereof is determined exclusively by market transactions when such are available. These cases are *In re Capital Stock of Morris Canal & Banking Co.*, 104 *N. J. Law,* 526, 141 *A.* 784; *Prall v. U. S. Leather Co.*, 143 *A.* 382, 6 *N. J. Misc.* 967. Those cases arose under two different statutes. In each, however, the requirement was that the stockholder should be paid the "full market value" of his stock. Obviously cases that fall under a statute which defines the full market value as the amount which the stockholder shall be paid are distinguishable from a case such as the one *sub judice* which falls under a statute which requires that "value" be paid.

Special interpretative significance is to be deduced from the difference in phraseology between the New Jersey and the Delaware statutes. *Section* 108 of the *General Corporation Act* of New Jersey of 1896 (*P. L.* 1896, *p.* 312 [2 *Comp. St.* 1910, *p.* 1661]) provided that a dissenter in the case of a merger should have his stock appraised and be paid the "full market value" thereof. This appears to have been the New Jersey law since 1883. *Dill on New Jersey Corporations,* (5*th Ed.*) *pp.* 230, 231. The original of the present *General Corporation Law* of Delaware was enacted in 1899 (21 *Del. Laws, Ch.* 273). The section of the act which provided for the appraisement of the stock of an objector to a merger was numbered 56. It now bears the section number 61. The language in the original, like the language in the present section, provided that the objector should be paid the "value of the stock at the date of consolidation." Thus the Delaware act in its original form in the matter of valuation of stock in cases of merger constituted a material variance from the language of the then existing general act of New Jersey. Instead of "the full market value" prescribed by New Jersey, the Delaware Legislature prescribed simply "value."

This circumstance is emphasized because it is common knowledge that the general act of this State adopted in 1899 was modeled after the then existing New Jersey act (2 *Comp. St. N. J.* 1910, *p.* 1595, § 1 *et seq.*) Chancellor Nicholson expressed judicial recognition of what is thus commonly known in *Wilmington City Ry. Co. v. People's Ry. Co.,* (*Del. Ch.*) 47 A. 245. See, also, *Slaughter, Rec'r., v. Moore, et al.,* 9 *Del. Ch.* 350, 373, 82 A. 963; *Cooney Co. v. Arlington Hotel Co.,* 11 *Del. Ch.* 430, 434, 106 A. 39, 7 A. L. R. 955; *Wittenberg v. Federal Mining & Smelting Co.,* 15 *Del. Ch.* 147, 162, 133 A. 48. So far is recognition accorded to the *New Jersey Act* in the form in which it existed on about March 10, 1899, when our General act was approved, as the pattern on which the latter was drawn. that Chancellor Nicholson in the *Wilmington City Railway*

*Case, supra,* indicated that the rule of construction was applicable to our act in its relation to the New Jersey one, which is to the effect that, as stated by *Sutherland on Statutory Construction,* § 333, "where the terms of a statute which has received judicial construction are used in a later statute, whether passed by the legislature of the same state or country or by that of another, that construction is to be given to the later statute."

If the adoption of the language of the statute of another state carries with it the adoption of the judicial construction placed upon it by the courts of that state, *a fortiori* it must be true that a departure by the adopting state from the phraseology employed in the model indicates a difference in legislative intent. It is not the same as but is in analogy to the principle that when the Legislature adopts an amendment changing the phraseology of an existing act, it is to be presumed that a change of meaning was intended. 59 *C. J.* 1097, and cases there cited.

When, therefore, the Legislature of this State, having before it the New Jersey act with its yard stick of "full market value," rejected that standard of measurement and used the simple one of "value," the inference is strong that as there was a design in the varying of the manner of expression there was a like design in the varying of the intent or meaning.

The difference in language between the New Jersey and Delaware acts not only renders the two New Jersey authorities above referred to as cited by the complainant irrelevant in the consideration of this case, but as well, because of the historical background of our statute, persuasively demonstrates that "value" as used in *Section 61* of our act is not synonymous with market value. I am of the opinion that when the appraisers based their finding of the value of the defendant's stock on evidence of market quotations alone, they adopted an erroneous rule for their guidance.

Even if the word "value" as used in the Delaware act

were not aided in its interpretation by the peculiar history which lies behind our statute, the answer to the present point would be the same.

What is the purpose of provisions of statutes which provide for the appraisement of the stock of a person who objects to the merger of his corporation with another? At common law it was in the power of any single stockholder to prevent a merger. When the idea became generally accepted that, in the interest of adjusting corporate mechanisms to the requirements of business and commercial growth, mergers should be permitted in spite of the opposition of minorities, statutes were enacted in state after state which took from the individual stockholder the right theretofore existing to defeat the welding of his corporation with another. In compensation for the lost right a provision was written into the modern statutes giving the dissenting stockholder the option completely to retire from the enterprise and receive the value of his stock in money. Most of the statutes provide that what the unwilling stockholder who refuses to accept an interest in the consolidated enterprise shall be paid is the "value" of his stock. It is so in Delaware, Connecticut, Idaho, Massachusetts, Missouri, North Carolina, New York and Vermont. "Fair value" is the phrase used in Maryland, Rhode Island and Tennessee, "fair cash value" in Arkansas, Florida, Louisiana, Minnesota, Nevada, Ohio and Virginia. These expressions, it seems to me are practically synonymous.

When a stockholder buys stock it is to be supposed that he buys into a corporation as a going concern. He does not buy on the theory that he is about to participate in a contemplated liquidation of the corporation's assets. He buys an aliquot share of a business, and he probably takes into account, or should at least take into account, not alone its present asset condition and earning power but as well its future prospects as a continuing enterprise. When a merger proposal is put through with which he chooses to dissociate himself, he is forced out of his investment and

compelled to abandon his association with a business of which he was a part owner. As to him, the going concern is done. Others have decreed its cessation against his will. What he has been deprived of is his proportional share of an active enterprise which but for the compulsion of others he could continue to be associated with in the indefinite future. What he is deprived of is what he should be paid for. In *Matter of Fulton,* 257 *N. Y.* 487, 178 *N. E.* 766, 767, 77 *A. L. R.* 608, the Court of Appeals in construing the statute which provided that the appraisers should "estimate and certify the value of such stock at the time of such dissent," held that the value of the stock should be fixed as if it were a going concern, by which of course is meant as if the merger had never been conceived. Those cases which take the view that the valuation is to be made as though the corporation was in dissolution, and which I omit from citing, do not appear to me as resting on a sound basis. Their logic would confine the appraisal to the strictly asset basis, leaving out of account all the elements which contribute to value as incidental to a going enterprise.

When it is said that the appraisal which the market puts upon the value of the stock of an active corporation as evidenced by its daily quotations, is an accurate, fair reflection of its intrinsic value, no more than a moment's reflection is needed to refute it. There are too many accidental circumstances entering into the making of market prices to admit them as sure and exclusive reflectors of fair value. The experience of recent years is enough to convince the most casual observer that the market in its appraisal of values must have been woefully wrong in its estimates at one time or another within the interval of a space of time so brief that fundamental conditions could not possibly have become so altered as to affect true worth. Markets are known to gyrate in a single day. The numerous causes that contribute to their nervous leaps from dejected melancholy to exhilarated enthusiasm and then back again

from joy to grief, need not be reviewed. It would be most unfortunate indeed either for the consolidated corporation or for the objecting stockholder if, on the particular date named by the statute for the valuation of the dissenter's stock, viz., the date of the consolidation, the market should be in one of its extreme moods and the stock had to be paid for at the price fixed by the quotations of that day. Even when conditions are normal and no economic forces are at work unduly to exalt or depress the financial hopes of man, market quotations are not safe to accept as unerring expressions of value. The relation of supply to demand on a given day as truly affects the market value of a stock as it does of a commodity; and temporary supply and demand are in turn affected by numerous circumstances which are wholly disconnected from considerations having to do with the stock's inherent worth.

I readily agree that for many purposes market values when they exist are accepted by the courts as the values to be taken for the admeasurement of damages. This is so in actions for the conversion of chattels, and may in some circumstances be equally so in actions for the conversion of shares of stock. The reason is that, generally in such cases the plaintiff can easily step into the market and replace presumably at the quoted prices the chattels or stock which the defendant converted. Paying him the market price puts him as a rule in position to restore what was taken from him.

But how can the payment to the holder of stock of its market value put him in the way of restoring his position as a continuing part owner of a going corporation, when a merger has destroyed its individual identity and wiped out of existence all the stock of the kind he owned? As there is none in existence, none is available to be bought. The only restoration that can be made to him is to substitute for the vanished stock its intrinsic worth, and if the market quotations are lower than what all the relevant facts that bear on value show it to have been worth, he

should not be compensated according to the market's estimate.

I have examined the numerous cases cited on the briefs by the solicitors for the respective parties. There is only one of them that bears such a similarity to this one in its facts as to deserve mention as precisely in point. The cases I may say are relatively few in number which deal with the valuation of the stock of persons who dissent to corporate action of various sorts and who are allowed by statute to be paid the value of their stock. These cases may be found cited and reviewed in interesting articles published in the following law journals. 45 *Harvard Law Review,* 233 (258) ; 15 *Cornell Law Review,* 420 (436) ; 32 *Columbia Law Review,* 60 (66).

The case to which reference should be particularly made as applicable here is the case of *Matter of Ames,* decided by the Supreme Court of New York. Unfortunately the case is not officially reported. The decision of the trial court appears in the *New York Law Journal,* January 15, 1930. It was affirmed by the Appellate Division without opinion, *Ames v. Godchaux Sugars, Inc.,* 229 *App. Div.* 858, 243 *N. Y. S.* 798, and by the Court of Appeals without opinion, *Ames v. Godchaux Sugars,* 256 *N. Y.* 676, 177 *N. E.* 189. I am safe, I think, in accepting as correct the report of this case as given by the author of the article appearing in 32 *Columbia Law Review* 60 (62, 72). The suit was one in which the petitioners objected to a reclassification of their preferred stock and demanded a valuation and payment thereof under *Section* 38 (12) and *Section* 21 of the *Stock Corporation Law of New York (Consol. Laws,* 59). The appraisers were to certify the "value" of the objecting stock. The language was thus the same as is found in the Delaware act—"value." In that case there was a market for the stock. The market was a fairly active one over the Chicago counter and ranged from seventy-four dollars to eighty dollars per share. The appraisers took evidence upon the earnings of the corporation, its prospects,

reproduction value, asset value, market quotations, etc., and found the value of the preferred stock to be ninety-five dollars per share and ten dollars to be the value of the dividends accumulated thereon. It was contended in that case as it is contended here, that the disclosed market prices should control on the question of value. But the appraisers answered: "The appraisers, having made a full examination of the status of the company and its prospects, are in a better position to gauge the fair value of the stock than the outside public." The editor of the article referred to makes the observation which is a just commentary upon the significance of that case: "Faced on appeal with the question of whether the market value of the shares was the standard valuation intended by the Legislature, both the Appellate Division and Court of Appeals affirmed the Supreme Court without opinion."

*Cole v. Wells*, 224 *Mass.* 504, 113 *N. E.* 189, 191, was a case involving the sale by a corporation of all of its assets. There was a statute of Massachusetts providing that in such case an objecting stockholder should be paid the "value" of his stock. In discussing the meaning of the term "value" as used in the statute, the Supreme Judicial Court declared it to be "obvious that 'the value of the stock' means not merely the market price if the stock is traded in by the public, but the intrinsic value, to determine which all the assets and liabilities must be ascertained." The view was also expressed that value was to be ascertained as if liquidation had been voted, a view which, as before indicated, seems to me to be too restricted in a case where as here the question arises in connection with a merger. I cite the case particularly to show that in the judgment of so eminent a tribunal as that of the court of last resort in Massachusetts, "value" when used in such statutory connections as are here presented is not to be restricted in its measurement by the opinions of others as they are revealed by market quotations. It is stated by the solicitors for the complainant that the utterances of the Massachu-

setts court upon the point referred to are only dicta. That appears to be so, not only because of the state of the pleadings in the case before the court, but as well because there does not appear to have been any market quotations for the stock there involved. There appears also to have been no market for the shares which were before the Court of Appeals of New York in the case of *Matter of Fulton*, 257 *N. Y.* 487, 178 *N. E.* 766, 79 *A. L. R.* 608, before cited, and so it may be said that the court in that case gave expression to a dictum when it observed that "the payment of such actual value, even if more than the market quotation, is the price that must be paid by the corporation for the privilege of requiring a sale over the protest of the dissenting stockholders who in effect are being ousted from the corporation." These dicta, notwithstanding the facts did not call for their utterance, nevertheless appear to me to be grounded in sound reason. In *Matter of Ames, supra,* however, there was a market for the stock, and the decision of the court therefore upon the meaning of "value" as not being restricted to market estimates, is directly in point here. That is the only case so far as I know where the facts required a decision upon the precise question here presented.

The instant case calls for an answer to the narrow question—is "value" to be measured exclusively by market quotations when the same are available? The conclusion of the court is that it is not. Therefore the complainant is not entitled to compel the defendants to surrender their stock at the price ascertained by the appraisers, when it appears that the judgment of the appraisers was founded solely on market quotations to the exclusion of all other relevant evidence bearing upon value.

The answer avers enough in the way of other evidence which should be taken into account in a valuation of the stock to warrant further proceedings in the cause. The motion for decree notwithstanding answer will therefore be denied.

There is no need at this stage of the case for me to enter upon a discussion of the sort of considerations which should be taken into account in the valuing the defendants' stock. Market value undoubtedly is a pertinent consideration. So is net asset value. Neither, however, deserves necessarily to be accepted as exclusive. Those are the only two standards of measure that the respective parties to this cause have insisted upon as governing, and I shall abstain from embarking upon a general discussion touching other possible elements that might under varying circumstances be taken into account.